**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | |
|---|---|
| BRETON S.p.A., | Civil No. 05-2631 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR A PRELIMINARY INJUNCTION** |
| CAMBRIA COMPANY, | |
| Defendant. | |

Peter M. Lancaster, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402-1498, for plaintiff.

Timothy D. Kelly, **KELLY & BERENS, PA**, 80 South Eighth Street, Suite 3720, Minneapolis, MN 55402, for defendant.

Plaintiff Breton S.p.A. ("Breton") is an Italian company that develops and sells technology for making granite slabs for countertops and other uses. This technology is the Bretonstone® System. Cambria is a Minnesota company that bought the Bretonstone® System and entered into a contract with Breton for exclusive rights to sell these granite slabs in the United States. The exclusivity contract expired in 2004. The parties now dispute the legal effect of an agreement made on March 23, 2005.

This matter is before the Court on the parties' cross motions for preliminary injunction. Breton has moved for a preliminary injunction that would enjoin Cambria from building a second production line using the Bretonstone® System, selling its plant, and disparaging Breton to potential business partners of Breton. Cambria seeks a

preliminary injunction that would enjoin Breton from delivering Breton equipment to other business partners such as DuPont in the United States.

For the reasons discussed below, the Court grants in part both parties' motions for preliminary injunction.

## BACKGROUND

Breton has proprietary technology in the Bretonstone® System relating to the construction of plants for the manufacture of compound stone slabs. The "Breton Know-How" includes patented methods and devices, production details, and technical knowledge that is protected and licensed as trade secrets. In 1999, the parties entered into two contracts to permit the construction of a plant for operation by Cambria in Minnesota using the Bretonstone® System. The Sales and License Agreement was a contract for the provision of machines, technical documentation, and technical assistance. Breton provided its "Know-How" to Cambria through manuals, various technical specifications, and practical training provided by Breton technicians. The Sales and License Agreement provided that defendant was obligated to protect the confidentiality of Breton Know-How:

> 9.5) The transfer of the know-how to any third party, as well as the spread of news about the Bretonstone® System technology, are strictly forbidden. For purposes of this contract, spread the news means that [defendant] shall not disclose material nonpublic information about the Bretonstone® System technology.
>
> 9.6) [Defendant] undertakes not to disclose any confidential information concerning the know-how, even in case of discontinuance of business.

The Exclusivity Agreement granted Cambria a limited but exclusive right to buy Bretonstone® plants to manufacture granite slabs in the United States. Cambria paid $3.6 million for the exclusivity, which lasted until May 2003. The Exclusivity Agreement established bilateral exclusivity obligations and required Cambria to purchase machines only from Breton. Cambria paid $1 million to extend the Exclusivity Agreement for one year to May 2004.

Top executives from both companies met in Italy on March 23, 2005 to negotiate Cambria's purchase of a second production line and extended exclusivity rights. The meeting took place without lawyers and produced a "chalkboard agreement" that the parties signed. Essentially, the parties negotiated key terms of the parties' future relationship and wrote the language on a whiteboard. After agreement had been reached, the parties took the unusual step of signing the board and then took a photo of it. Details on the circumstances of the March 23 meeting are discussed below.

Cambria maintains that the agreement is legally binding and therefore Cambria has the exclusive right to make granite with Breton's process in the United States. Breton maintains that the whiteboard agreement was merely an "agreement to agree" and that Breton was to prepare a formal, legally binding contract for both parties' signatures. Because the parties could not execute a formal contract, Breton argues that Cambria does not have exclusivity and Breton is free to authorize DuPont to build a plant in the United States.

## ANALYSIS

Injunctive relief is appropriate where the moving party shows that: (1) there is a likelihood of success on the merits; (2) the movant will suffer irreparable harm absent the injunction; (3) the balance of harms favors the movant; and (4) the public interest favors the movant. *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981). "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction." *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986).

The Court discusses Breton's motion for a preliminary injunction in Part I and Cambria's in Part II.

## I. BRETON'S MOTION FOR PRELIMINARY INJUNCTION

### A. Likelihood Of Success

Breton argues that it is likely to succeed on its claims for 1) breach of contract and threatened trade secret misappropriation; and 2) interference with contractual and business relationships. The Court discusses each of these claims in turn to determine defendant's likelihood of success on the merits.

#### 1. Breach Of Contract And Trade Secret Misappropriation

Breton has moved for a preliminary injunction in part to prevent Cambria from building a second line for its plant through the misuse of Breton's confidential information and trade secrets. Breton is also concerned that Cambria will sell its plant

and therefore disclose confidential information and trade secrets to a third party. Breton's concerns are based on Cambria's statements that it will take "action to obtain or construct the required equipment through alternative" means and "sell [its] business immediately."

Breton argues that Cambria's threatened actions will violate the 1999 agreement, which protects Breton Know-How. Article 9.6 states, "The BUYER undertakes not to disclose any confidential information concerning the know-how, even in case of discontinuance of business."

In addition, Breton seeks protection under the Minnesota Uniform Trade Secrets Act, which provides for damages and injunctive relief. It requires: (1) the existence of a trade secret; (2) that the defendant acquired that trade secret through a confidential relationship; and (3) that the defendant misused or threatened to misuse the trade secret. *See* Minn. Stat. § 325C.01-.03.

Breton must first show existence of a trade secret, which is established by proof of three other facts: (1) that the secret is not generally known or readily ascertainable, (2) that it has economic value, and (3) that the holder of the secret has taken reasonable steps to maintain its secrecy. Minn. Stat. § 325C.01; *Strategic Directions Group, Inc. v. Bristol-Meyers Squibb Co.*, 293 F.3d 1062, 1064-65 (8th Cir. 2002).

Breton identifies its trade secrets as primarily the information contained in the Breton Know-How Manual. The Know-How Manual sets forth in detail the process information and recipes for making Bretonstone® products. Cambria asserts that Breton has not taken reasonable steps to protect the secrecy of this information and emphasizes

that Breton never labeled the Breton Know-How Manual as confidential. *See Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 903 (Minn. 1983) (holding that documents not marked confidential were not trade secrets).

While there are similarities between this case and the situation in *Electro-Craft*, the Court finds that Breton has a reasonable likelihood of success in showing that its steps to protect the secrecy of its Know-How are reasonable. Specifically, Breton protects the confidentiality of its Know-How by insisting that its licensees, employees, consultants, and suppliers agree not to disclose any confidential information. Furthermore, Cambria has made statements that show it knew it was obligated to protect Breton's confidential information. For example, in an email between the companies' executives Cambria stated, "We, as always, will honor the confidentiality we agree to and uphold it throughout." Under Minnesota law, Breton does not need to label the Know-How Manual as confidential if Cambria knows or has reason to know that Breton intends or expects the secrecy. Minn. Stat. § 325C.01 subd. 5.

Accordingly, the Court concludes that Breton has alleged sufficient facts at this stage of this proceeding to demonstrate a reasonable likelihood of success on its breach of contract and trade secret misappropriation claims.

### 2.   Interference with Contractual and Business Relationships

Breton also wants a preliminary injunction to stop Cambria from interfering with Breton's relationships with other business partners. Cambria has threatened litigation to

prevent Breton from selling the Bretonstone® System to other companies in the United States.

"One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation." Restatement (Second) of Torts § 766B (1979); *see United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 632-33 (Minn. 1981).

Litigation and threat of litigation can constitute improper interference with business relationships:

> Litigation and threat of litigation are powerful weapons. . . . The use of these weapons of inducement is ordinarily wrongful if the actor has no belief in the merit of the litigation or if, though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication.

Restatement (Second) of Torts § 767, cmt. c (1979).

To determine whether Cambria's threat of litigation is improper, the Court must assess whether Cambria has a legitimate basis for claiming exclusivity. As discussed below, the Court finds that Cambria has shown a reasonable likelihood of success in its claim that it has a right to exclusivity under the March 23 agreement. As such, Breton does not have a reasonable likelihood of success in showing that Cambria has improperly

interfered with its business relationships. Therefore, the Court will not enjoin Cambria from threatening litigation to enforce its exclusivity.

### B.     Irreparable Harm

"[T]he mere threat of misappropriation of trade secrets constitutes irreparable harm and warrants injunctive relief." *Equus Computer Sys., Inc. v. N. Computer Sys., Inc.*, 2001 WL 1636487, *4 (D. Minn. May 4, 2001); *see* Minn. Stat. § 325C.02. In an email between the companies' executives, Cambria threatens to "sell [its] business immediately." In a fax sent by Cambria's legal counsel, Cambria threatens to take "action to obtain or construct the required equipment through alternative" means. A sale of the plant may disclose trade secrets and construction of a second line may misuse trade secrets. This factor tilts heavily toward issuance of a preliminary injunction.

### C.     Balance of Harms

A preliminary injunction that prevents Cambria from building a second line or selling its plant will not cause more harm to Cambria than it prevents to Breton. Cambria argues that it needs to build a second line to satisfy demand for products that will soon exceed the capacity of its plant. The Court is not convinced that this alleged harm is imminent. Furthermore, Cambria has not shown any need to immediately sell its plant without authorization from Breton. The Court is confident that an early trial date will ensure that any harm to Cambria is minimized. Thus, this factor also weighs in favor of issuance of a preliminary injunction.

### D.   Public Interest

The fourth and final *Dataphase* factor to be considered is whether public interest favors issuance of a preliminary injunction. *See Dataphase*, 640 F.2d at 114. Enforcing valid contracts and preventing the unauthorized use and disclosure of trade secrets and confidential information always serve the public interest. The Court finds that this factor also favors issuance of a preliminary injunction.

## II.   CAMBRIA'S MOTION FOR PRELIMINARY INJUNCTION

### A.   Likelihood Of Success

Cambria seeks injunctive relief to enforce exclusivity rights that it argues Breton granted to Cambria in the March 23 agreement. Breton argues that the March 23 agreement was merely an "agreement to agree," which lacks substantial terms and is unenforceable.

There are several factors used by courts to determine whether a contract has been concluded:

> the extent to which express agreement has been reached on all the terms to be included, whether the contract is of a type usually put in writing, whether it needs a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether a standard form of contract is widely used in similar transactions, and whether either party takes any action in preparation for performance during the negotiations.

Restatement (Second) of Contracts § 27. cmt. c; *see Luigino's Inc. v. Societes des Produits Nestle S.A.*, 2005 WL 735919 at *6 (D. Minn. Mar. 30, 2005).

Breton points to several facts that could lead to an inference that the March 23 agreement should be not binding. The agreement was written on whiteboard, and the portion of the agreement dealing with exclusivity consists of only these words: "Exclusive right: up to July 2008. If Plant n. 3, up to July 2011." Given the sophistication of the parties and the complexity of the transaction contemplated, it is difficult to infer that the parties intended to be bound by the markings on a whiteboard. Indeed, the contract that had governed the parties' relationship since 1999 was very detailed and totaled about 150 pages.

Nevertheless, Cambria alleges sufficient facts to create an inference that the March 23 agreement should be binding. The March 23 agreement lacked detail, but it contained essential terms, including the scope of new plant, purchase price, delivery details, payment steps, and security for payment. Probably most importantly, the parties signed the whiteboard and celebrated the agreement.

The enforceability of the March 23 agreement must be resolved at trial, but the Court concludes that Cambria has a reasonable likelihood of success on this issue.[1]

---

[1] Breton argues that even if the March 23 agreement was an enforceable contract, it is no longer binding because Cambria breached the contract by failing to send the money before April 15, 2005. *See* 14 Williston on Contracts § 43:5. Cambria responds that Breton excused Cambria's non-performance prior to the April 15 deadline, so Cambria cannot now be accused of a material breach. *See Mutual Reserve Life Ins. Co. v. Heidel*, 161 F. 535, 537-538 (8th Cir. 1908)("An extension of the time of payment of the first premium . . . waives all forfeiture for nonpayment . . . .").

Breton also argues that the formal written contract drafted by Breton and sent to Cambria is binding because Cambria failed to timely object to it. *See* Minn. Stat. § 336.2-207. Cambria responds that the formal contract falls within an exception to this rule because it materially

(Footnote continued on next page.)

### B.     Irreparable Harm

Cambria has a strong argument that it faces irreparable harm if its motion for a preliminary injunction is not granted. If Breton sells another company a plant in the United States, Cambria forever loses its exclusivity. This harm cannot be undone, and it would be extremely difficult to calculate economic damages arising from the loss of exclusivity. The Eighth Circuit has recognized the well-established "authority of a trial court to issue a preliminary injunction to ensure the preservation of an adequate remedy." *Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1227 (8th Cir. 1987). This factor tilts heavily towards issuance of a preliminary injunction.

### C.     Balance Of Harms

Preventing Breton from selling a plant to another company in the United States preserves the status quo and prevents harm to Cambria, but the Court recognizes that exclusivity is a valuable right. Cambria has paid as much as a million dollars per year for exclusivity in the United States. Without specific monetary requests, the Court is reluctant to order Cambria to pay for the extended exclusivity at this time. If the parties are unable to agree on an amount for interim exclusivity, and if at trial the jury

---

(Footnote continued.)

altered the chalkboard agreement by requiring a letter of credit. *See id.* Further, Cambria asserts that it did timely object.

These issues must be resolved at trial, but the Court concludes that Cambria has a reasonable likelihood of success of resolving them in its favor.

determines that Cambria did not have a right to exclusivity under the March 23 agreement, the Court will ask the jury to assess interim damages to Breton for this period of uncompensated exclusivity to Cambria. The Court believes that it is in the best interests of both parties to prevent Breton from selling a plant to another company in the United States until after the legal effect of the March 23 agreement is determined.

### D. Public Interest

There is a public interest in protecting legitimate contractual rights, but the Court does not believe that this factor tilts substantially either way in this case.

## III. CONCLUSION

The Court finds that both parties are entitled to a preliminary injunction to prevent irreparable harm until the merits of the claims are resolved at trial. If requested by both parties, the Court will grant an expedited trial date.

### ORDER

Based upon all of the files, records, and proceedings herein, and upon the argument of counsel, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for a preliminary injunction [Docket No. 9] is **GRANTED IN PART**. A preliminary injunction is hereby entered against defendant Cambria as follows:

Until further order of this Court, absent explicit written permission from plaintiff, defendant is hereby enjoined from misusing or transferring plaintiff's confidential

and trade secret information, including, specifically, a) manufacturing, purchasing, installing, or operating machines, machine components, or machine parts other than those previously purchased from plaintiff, if such machines, components, or parts use any aspect of the Bretonstone® System process; and b) disclosing to any potential third party purchaser of, or equipment supplier to, defendant's Bretonstone® System plant the processes or materials used to create Bretonstone® System products.

2. Defendant's motion for a preliminary injunction [Docket No. 16] is **GRANTED IN PART**. A preliminary injunction is hereby entered against plaintiff Breton as follows:

Until further order of this Court, absent explicit written permission from defendant, plaintiff is hereby enjoined from delivering Breton equipment in the United States.

3. In accordance with Fed. R. Civ. P. 65(c), each of the above-ordered preliminary injunctions shall become effective upon the moving party posting a bond with the Clerk of Court in the amount of fifty thousand dollars ($50,000) for the payment of such costs and damages as may be incurred or suffered by the parties in the event either party is found to have been wrongfully enjoined.

DATED: February 9, 2006            s/ John R. Tunheim
at Minneapolis, Minnesota.            JOHN R. TUNHEIM
           United States District Judge